I'm Alan Foster and I represent the Relator. I'd like to make two points. The standard applied by the district court to the direct knowledge requirement for an original source was wrong. And second, that under virtually any standard, MJ had direct knowledge because in the face of a conspiracy of silence among the defendants, MJ ferreted out the fraud through its own efforts, unmediated by anyone else. When I say own efforts unaided by anyone else, well, now it seems to me that there's a concession in this case that all of the material upon which Relator relied were public documents that were in the public domain. No, Your Honor, no such concession. In fact, quite the contrary. Indeed, one of the most important documents upon which MJ relied was the Caltech invention disclosure form, which was certainly not a public document, which MJ ferreted out through its own efforts by sending a person who worked for MJ to Caltech who viewed it with his own eyes. And as in Wang, in this court's holding in Wang, Wang viewed the evidence of the fraud with his own eyes. He didn't view the fraud with his own eyes. He viewed the evidence of the fraud with his own eyes because he was sent in after the fraud had actually occurred to find a solution to the problem of the gears that were allegedly the source of the fraud. And so just as here, MJ came in, saw the evidence of the fraud with his own eyes, totally private document, and that evidence led MJ to believe and to allege that, number one, the inventorship on the patents was incorrect because the invention disclosure form said that Dr. Hood was a witness, not an inventor, and he suddenly appeared as an inventor on the patent application. And secondly, it disclosed that there had been, it said that there had been no federal funds used in connection with the conception of the invention, which was a lie. So that's one example. I'll give you several more as we go along. But first, just let me point out to you what the district court did and where we believe the district court was squarely wrong. Let me ask the flip side of my question then. What is it that you're relying on that is a material element of the fraud which was not disclosed publicly before the filing? Oh, I'm sorry, I didn't understand your question. That was disclosed publicly before the filing, what I just told you. But the important point is that MJ is an original source because it had direct knowledge of that. That's the point. MJ qualifies as an original source because it had direct knowledge because it found out about that document through its own efforts, unmediated by anyone else. And that is the standard which this court has said in Devlin and in Wang, both directly, that is the standard and the only standard that applies. And what the district court did was to engraft two more requirements on that standard. So it was investigative efforts that it discovered this. Well, part of what it did was investigative efforts. Is that your part of it? That's part of it. They were doing a due diligence kind of investigation. That is accurate. Through their investigation. Well, it's not. Not covered this information. Not only through their investigation, but as part of their investigation, when they in essence were asked by the defendants to become a part of this conspiracy by participating in overcharging the government. They wrote a letter to Caltech asking specifically the question, were federal funds used in the conception of the invention? Caltech wrote MJ back. Now, this is not an investigation. This is being asked to be a part of this scheme. Caltech writes MJ back and says, no, again, a lie. Federal funds were used in the conception of the invention. But to give you some other examples of why MJ qualifies as an original source, granting that these things were published, granting that MJ still qualifies as a realtor because they are the original source based upon their own efforts unmediated by anything else. And to give you some other examples of precisely what they did. The second one is, of course, they got the letter of which they were an eyewitness to that lie. And they were at that point an insider to the fraud as well, or an invited insider to the fraud. Third, the MJ discovered through its own efforts, unmediated by anybody else, private information that the purported inventors do not have a single piece of paper to indicate that they did one single thing with regard to this invention before they filed this declaration with Caltech that they were the inventors. Now, to say the very least, this would be a first in science if purported inventors did not have a single piece of paper to indicate that they had done one single thing in connection with an invention before they claimed to have invented it. It also coincidentally happened about a month after the true inventor left Caltech and about two weeks after one of the purported inventors went to a private conference and heard a Japanese gentleman describe the same invention that he had come up with. And the question was asked of him at that private conference in front of one of the purported inventors. Will that work for DNA? And he said yes. And so what MJ discovered with its own eyes, the evidence of the fraud, they discovered a series of scientific improbabilities that are so extreme that almost no one could come to the conclusion that there was anything but fraud here. Now, another thing they discovered. I'm just thinking as you're making this presentation, the whole concept of the False Claims Act is to permit a whistleblower almost by definition, although it's not a technical term, be an insider who witnesses what's going on and blows the whistle. Now, MJ couldn't have been an insider at any significant point, could it? The one point that I make, they were an insider. But let's take that. There's the easy way and the hard way under the False Claims Act. The easy way is if you're exactly right. There is an insider who comes forth. But suppose the conspiracy of silence is seamless. How then does the fraud get discovered? What would the act say? When you're Congress, what are you going to do when the defendants are so successful that there is no insider to come forward? Well, the problem is the Congress defined the term original source as someone with, quote, direct and independent knowledge. Correct. And that's exactly. That's the opening you have to go through to move on. Yes, sir. And in Lange, for example, this court held that somebody who was not a party to the fraud, not an insider to the fraud, but indeed someone who was sent in to solve the problem. This court held that that person had direct and independent knowledge. And in Biddle, the person who had the direct and independent knowledge was a subsequent auditor that came in. And that was sufficient to have direct and independent knowledge. So there is absolutely no requirement as the district court imposed in this court that you have to be an insider. And furthermore, it would make no sense if there were. Because if the defendant what you would say is if the defendants are completely successful in preventing a whistleblower, then they get they get away scot free if that's the requirement. And that can't be the law. And so you say, what is the hard way? Well, the hard way, this court, I think, said it very well when it was trying to trying to define exactly what the what the balance is here. And it talked about Congress's attempt to find the golden mean between the opportunistic plaintiff who should not be able to be a relator and a plaintiff who actually does something, who brings something to the parties. As my teenage kid was kids would say, I would invite you to read the third amended complaint, which is in the record, despite despite its length. If you can honestly come away from reading the third amended complaint and say that MJ did not bring everything to the party that was brought to this party, then I guess there's no such thing as cracking the veil of silence because MJ brought everything of any value that was brought to this party. It brought everything to the attention of the government. It brought Dr. Wang's lab notebooks to the attention of the government that proved that he was an inventor, if not the only inventor of this device. It brought when the defendants contended with regard to reduction to practice, the defendants contended that the published reported articles, which acknowledged federal funding for reduction to practice, it contended, no, no, no. We really didn't mean that when we said we had federal funding. Really, we were meaning that that federal money was used to develop the device after it had been reduced to practice. MJ went and found the Caltech's lab notebooks that showed that reduction to practice had had occurred during a period of federal funding all the time. There's some cases where you say, well, isn't that something a federal investigator would have found out anyway? Some of the cases raised that point. In this case, there was a federal investigation and there were federal investigators and they didn't find any of these things. MJ, after MJ brought this matter to the government's attention, there were a couple of investigators who spent years working. They didn't find Dr. Wang's lab notebooks. They didn't find the Caltech notebooks that showed when the invention was reduced to practice. They didn't find the invention disclosure form. They didn't find the license agreement between Caltech and ABI that recognized the government's bi-dole rights. They didn't find any of those things. MJ found them all. And the issue is, did MJ bring something to the party that is so important in the face of the seamless conspiracy of silence that MJ should be considered to have direct knowledge of the fraud? I would submit to you, if you will read that third amended complaint, I don't think you can come to any other conclusion. And I'll reserve the remainder of my time if I may. I do so, counsel. Thank you. We'll hear now from the Appellees. Thank you, Your Honors. John Hacker for Appellee Caltech. I'll be taking 15 minutes and reserving five minutes for Mr. Reines on behalf of Appallera. Your Honors, this case is not about how and when false claims act cases may be brought. It is about how and when and which third party relators may take a share of the government's recovery. The relator, MJ, in this case, made a choice. Before filing his key TAM action, MJ decided first to spread its allegations of fraud through various media outlets. That's what raised the public disclosure bar identified by the district court in this case, forcing MJ to prove to the district court to adduce evidence adequate to establish that MJ was an original source of the information underlying its allegations. This case thus illustrates the answer, the answer to the question that Mr. Foster just asked. What would the False Claims Act look like if there's a seamless web of conspiracy, a veil of silence, as he put it? The answer is the False Claims Act would look exactly like it looks today. If you are a relator who works hard and uncovers a hidden fraud that's not already disclosed to the media, then you bring a key TAM action. You claim your share of the bounty. That's exactly how the key TAM act is designed, the False Claims Act and its key TAM provisions were designed to work. But if, like MJ, you choose first instead to spread your allegations of fraud in the media, then what Congress has said is you have to prove to the district court that you are within that narrow category of relators for whom the key TAM provisions were fundamentally and originally designed, that you are an original source of the information underlying the allegations of your complaint. The district court in this case found that MJ had not adduced sufficient evidence adequate to carry that burden. That finding is we submit unassailable. As Mr. Foster recognizes, the primary issue on appeal here is whether MJ's knowledge was direct in the meaning of the original source requirement as interpreted repeatedly by decisions of this court. As this court has held and other courts have held, time and again, the question, the definition, the word direct is defined by determining whether or not the relator had firsthand immediate knowledge of the information, unmediated by the labor or knowledge of others. Knowledge that is derivative of information of knowledge of others is not firsthand personal knowledge. That's what the key TAM statute is about. It is. What does Wang say then? Mr. Foster is relying on Wang, among others. Wang is very much on our side of the ledger, Your Honor, as indeed all the cases are. As Wang said, Wang was a case involving a relator who had direct involvement in the government project, in the government contracted issue, the Bradley fighting vehicle. Wang himself worked on that project. And for that reason, because Wang worked on that case, this court said he was an original source of the information underlying his allegations about the problems with that fighting vehicle. That's what the Wang case is about. What the Wang case also says, Your Honor, as a number of these courts have held, is that the policies, this supports the policies of the key TAM provision. Once information becomes disclosed to the media, as Wang says and other courts have said, and Judge Hall's opinion in the fine case says, there really isn't a purpose anymore served by a key TAM action. We don't need it because once it's disclosed to the media, the government, who is, of course, the primary beneficiary of a False Claims Act action, knows what it needs to know and can bring a suit as it desires. What the 1986 amendments did is say, for a small category, for a small category of cases that involve such prior media disclosures, we will carve out a category of relators who can bring those cases. And those are those who are, as this court put it in the fine case and in numerous other cases, those cases are reserved for the paradigmatic key TAM case, key TAM relator, the whistleblowing insider. Time and time again, this court has referred to the paradigmatic relator as the whistleblowing insider. MJ's knowledge simply does not satisfy that test at all. Look at their own declarations. Look at their own complaint. Look at the information they themselves repeatedly say that they relied on in uncovering what they believe to be the conspiracy and the pattern of fraud. It's set forth most clearly in the Corny Declaration, which starts in the record excerpts at page 105, I believe it is. Oh, yeah, 105. They rely on two 1986 magazine articles. That's not direct knowledge. They rely on public patent files, publicly disclosed patent files, information provided by Caltech. Again, information derived of others. That's not direct knowledge. What about the letter he got? The letter he got is also not direct knowledge, as this court has repeatedly held in numerous analogous cases. That is information from Caltech. That's information derived from Caltech. In the Alcan case, this court held that a union member who derived this information from other union members being told, like MJ was told by Caltech, about what they believed to be the fraud. That's not direct. In the Barth case, they interviewed employees. The union official in that case interviewed a number of insider employees, got the information from those employees. That union official was held to be not a direct source because his information was derivative of what he had been told by the insiders. Similarly, in Judge Breyer's decision in the Hansen case. Again, a relator who works very hard, investigates just as hard as they possibly can to uncover what they think to be fraud. Judge Breyer correctly said in the Hansen case, kudos to that relator. And in the normal situation, the relator can bring a key TAM action and take a share of the government, take a bounty, a share of the government's recovery. But where the relator, particularly here, chooses to spread the allegations of fraud in the media prior to that, then the relator doesn't qualify unless they're in that very narrow category that this court has repeatedly described as whistleblowing insiders. Consider the other information they rely on. Robert Cook Deegan's book, The Gene Wars. Again, nothing direct about that whatsoever. From Robert Cook Deegan, they become aware of Henry Wong. They talk to Henry Wong. Again, just like the Barth case, just like the Devlin case, where again, they speak to insiders, to inside employees, get information. And this court held that hearing something from an insider doesn't make you the insider, doesn't make you the firsthand source. The employees may well be an insider, but you are not. They interviewed other Caltech employees. We hear this morning about a Japanese conference, a Japanese conference. Mitchell Foster repeatedly refers to it as a private conference, which is totally meaningless, totally meaningless under this court's decisions about whether your knowledge is direct. Whether you had a private conversation with somebody when you derived your knowledge from them, your knowledge is, under that circumstance, nevertheless derivative, and therefore you are not the firsthand, immediate source of knowledge, the, as this court has put it, whistleblowing insider. The invention disclosure form that they relied on is provided to them by Ken Johnson of GTI, another entity, not an employee of MJ. Again, even that information is indirect for them and doesn't provide MJ with any significant information that it adds to its own, other than information derived from other sources and, most importantly, from public sources. In this case, it's so important to recognize it's so much of the information on which they rely. Again, according to the Corey Declaration itself, they're very clear about this. The information they derive in order to establish their allegations of fraud is almost entirely public, and the information that's not already public is information they derive and hear from other people. Again, pursuant to their own self-interested investigation, and I'm not even criticizing them for that, they investigated, just like did the investigator in the Hansen case, just like did the union officials in the Devlin case, or excuse me, the outsiders in the Devlin case, just like the union officials in the Barth case, and the Hayes versus Hoffman case in the Eighth Circuit. Again, people with an incentive to do the work, but once it becomes publicly disclosed, there isn't a purpose served, a particular purpose served, by the key tab statute, and Congress has said you can only bring your action under those circumstances if you have something of your own, some significant information of your own. That's what this Court said in Wang and Devlin. MJ has no information of its own. What it has is a compilation, a gathering of information provided by other people. That is not direct knowledge under this Court's cases. One other point I just want to emphasize in respect to the question whether or not MJ was an insider, within the meaning of the original source provision. The two points I want to make on that are, first of all, the existence of being an insider simply isn't enough to establish that you have direct knowledge. There are cases in which an employee, the Hayes versus Hoffman case is another one, where an inside employee is told by another employee information. That second employee, his information is held to be secondhand, not firsthand. So the mere fact that you're an insider isn't sufficient to establish that you have the requisite direct knowledge. The second point, of course, is that they aren't actually an insider within any meaningful sense of that term. As their own direct declarations, again, make quite clear, make absolutely clear, from the moment they began, they initiated this so-called business relationship, from the moment they began, they were making an effort to discover this information in order to establish that the government was not entitled to, or was entitled to a discount, and that most particularly, MJ didn't have to pay the discount. From day one, that was the entire process. Again, I don't need to criticize that to say there's anything particularly wrong with that. They had a business reason to do that. That's fine, but there's nothing, there's not a sense of due diligence in a potentially productive business relationship. This was an effort to accomplish something in their private interest. And again, what the statute says is, if you're somebody, for whatever reason, who has that private interest, you can do the government a service. You can bring an otherwise hidden fraud to the government's attention, to the public attention, and then you can share in the government's recovery. But if you don't have, as this Court has said, significant information of your own to add at that point, when the information is already available to the government, already publicly disclosed, then you don't fit within the category of original source, the whistleblowing insider, for whom the statute was originally designed. That's what the District Court held. In this case, we submit, as I said, that finding is unassailable. I'll reserve my time for Mr. Reynes. Thank you, Counsel. Mr. Reynes? Thank you, Your Honor. Preliminarily, I'd like to clarify some things. Could you introduce yourself? Sorry. Edward Reynes on behalf of Aplara Corporation. First, I'd like preliminarily to update the Court regarding the corporate disclosure statement of appellants. I know the Court takes those seriously. Two things. One is, there's an inaccuracy in there. MJ had a parent company, which is MJ GeneWorks. And the second thing, which is relevant, is MJ went bankrupt since the briefing and was purchased by a publicly traded corporation. And I don't think the panels had the benefit of that. Well, Counsel, would you please file a supplement to your brief, which relates to that particular portion of the brief as filed? It's not our brief. It's the other side. I just figured I'd raise it. I just thought that it would come up at the hearing today. A company named BioRad now owns them, which is publicly traded. All right. We'll ask Mr. Foster to take care of that. So at least our information at the time of submission will be correct. Thank you. Thank you, Your Honor. And there's a reason that they went bankrupt. The reason they went bankrupt is that Aplara and MJ are rivals, as the documentation shows. And MJ was found by the District of Connecticut to be a willful infringer for 10 years, dating back to well predating the 1998. What has that got to do with this case? What that has to do with it is exactly there's a host of relevant aspects for that decision. One of them is this claim now that they're an insider. There was no fact finding by the district court that they were an insider. And I think the facts in that decision that have been found against them, that in fact they were willful infringers defiantly in contest with them at the time, goes to the question of whether they were in conspiracy together and whether they were friendly parties. That's the only point with that. I think it's relevant. And I think the point is they're now claiming to be an insider and they're saying the 1998-1999 relationship between MJ and Aplara is important to the analysis of whether they're an insider, whether they're a whistleblower or whatever else. And I think there's additional fact finding on that. I don't think that can be resolved on the current record and certainly wasn't resolved in their favor on the current record. That's just the point I wanted to make on that. And that's 372 F sub second 233. That's just a related case to this. And we can fill out one of the forms, Your Honor. The next point that I wanted to raise is. Please do before leaving the courtroom. The next point I want to raise is on Judge O'Scanlan's questioning about isn't this all in the public domain. The test is direct and independent, right? So it's both prongs have to be satisfied. And I think the issue is the argument that was made by Mr. Foster is the publications, the NAR article and the Nature article in the 1980s both disclosed that the reduction of practice that's at issue here was funded by the government. That's what he argued. And the information that they use that they obtain has to be both independent and direct. And that's not independent. That's a public disclosure that's admitted right in front of this court now. And they're obtaining that information from those public sources is insufficient because it's not independent. And the test on independence, which is conjunctive with direct and direct was addressed. So I'm not going to go over that ground. The test for that is whether the public information enabled the government to pursue an investigation. Well, obviously, publications that say the government funded the research, that's the fraud. I mean, the fact that the denials are not the fraud. So in other words, when Mr. Foster speaks of lies, that's sort of cross-examination material that at other times the Caltech was denying that the public funds were used. The discovery was public funds were used. That's the fraud. That's what they're saying they found. That's what they're saying they discovered. That was as public as could be. And that would have given the government a basis to investigate. And importantly, in the Alcan case, the court said the issue isn't whether the government's likely to learn it. I mean, that's the argument, is the government didn't go to these files and find this article. The NAR article didn't go find these things. The question isn't whether the government's likely to find it. The question is what was in the public domain. And could the government, had it known that the reduction of practice was publicly funded, could it have investigated? Obviously, yes. So on the second set of allegations, which is the public funding, clearly that's in the public domain. Clearly, not only is it not direct, as was argued before, but also it's not independent. It's not. The other set of allegations is the Henry Huang allegations on inventorship, and that's where the lab notebooks and things come up. Two things regarding that other class of allegations, and appellants are the ones that make the distinction. So there's the public funding, which was clearly in the public domain. There was nothing more that needed to be done by the government. And then the Henry Huang allegations. The Henry Huang allegations were resolved in the district court. Central District of California found that all the allegations that Henry Huang was an inventor that had not been proven. In the briefing, it was suggested that there would be an appeal of that. There was no appeal of that. That's now conclusively resolved. And so those allegations just don't go anywhere. There's a question about whether that's binding on, in this case, and I believe it is. That's a Section 285 inventorship proceeding. It's notice to all concerned or available. So I think that should be binding on them. If this were to go down on remand, I think it would be resolved. That's dead on arrival, the Huang. So it's important to distinguish the inventorship allegations, which have been resolved by a district court, and the public funding allegations, which I think were clearly in the public domain. And I think both fail for the reasons I said as well as the reasons stated earlier. We had also referenced the primary jurisdiction doctrine in our briefing. I think our briefing sets that forth. The basic point is, as set forth in the COI declaration, which is in the record at 110, there's a multi-agency task force involving the DOJ, HHS, OIG, on and on, NIH, that has been studying this thing for years. They've been taking new information, the result of the district court proceeding recently. There are no pending agency investigations with respect to this particular matter, are there? They have not been closed. So they're still pending. I think they still received the papers from this case. There has been no final disposition one way or the other. The activity level, I don't know. But certainly there is a multi-agency working group operating on it, and I think there's been a lot of investment in that. And I think that should be resolved one way or the other before any court goes through. What would be the result of that that would be relevant to this case? I think the result of that is if they decide the question of whether something is a subject invention under the Bayh-Dole Act is for the agency in the first instance. And the determinations relating to that, there's appeal procedures, there's administrative proceedings regarding that. If they found that it was a violation of Bayh-Dole, then we could go through the administrative proceeding and pursue that. So that's the benefit. The district court really never resolved this issue, correct? The district court never resolved the primary jurisdiction. They said that it was of interest but did not exercise its discretion. That's correct. Well, based on the approach that it took. There was no subject matter jurisdiction, so it didn't reach the discretionary question whether it should exercise it. Right. Okay. The court did find that the district court stated on the independent prong that it thought there were some factual disputes and so forth on that. I think based on the argument of Mr. Foster that, in fact, the public funding of the reduction of practice was publicly disclosed in the Nature article about a major invention and an N.A. article. There's just no question that independence can't be met for the public funding aspect. What did you argue at the district court with respect to primary jurisdiction? Primary jurisdiction, the argument was that the multi-agency working group should be permitted to perform and finish its work and that, therefore, the court should decline to perform jurisdiction should it find that it had subject matter jurisdiction. That's just something on a remand. At a minimum, the court needs to keep in mind. But you're not urging that at this point? Well, I think it's important to take the affirmance. Unless there's subject matter jurisdiction, there's nothing to decline. Thank you. Thank you, counsel. Mr. Foster, you have a considerable amount of reserve time. Thank you, Your Honor. And I'd like to respond to some of these things. First, let's talk about Wang. Remember I said that Wang had been called in, did not see the fraud, had been called in and saw the evidence of the fraud, just like MJ in this case. And here's what the Wang court said. In 1983, a member of the Bradley family of vehicles, the multiple launch rocket system, was experiencing gear failures. Wang, who was trained in gear technology, was part of the team of FMC engineers called in to study the problem. Now, this is the gear problem was the underlying fact in the false claims issue. In other words, that the contractor had supplied to the government a fighting vehicle with a gear problem that it knew was bad, and thereby had not in accordance with the specifications, the government specifications, and thereby had submitted a false claim. So here is Wang, who knows nothing about how the gear problem developed, knows nothing whatsoever about what representations were made to the government about it. His entire knowledge is derived because he is called in to study the problem. And so there is obviously no requirement by this circuit under Wang that someone has to be an eyewitness to the fraud, which is what the district court held in this case. So that the engrafted eyewitness requirement, the insider eyewitness requirement, just doesn't exist in this circuit. That's all there is to it. And that's what was applied by the district court. And the Wang court goes on to say Wang had personal knowledge of the Bradley's transmission problems because he worked however briefly, he only worked two weeks on it, on trying to fix them. So the court is clearly aware of the fact that Wang was not an eyewitness to the fraud, and that can't be the law of the circuit. Second, the argument you heard was about all of the examples of what MJ did. That was public knowledge, none of which did I rely upon when I was arguing to you. I relied upon all things that MJ did that were not in the public domain. The Caltech information disclosure invention disclosure was certainly not in the public domain. The Henry Wang notebooks were certainly not in the public domain. The letter from Caltech directly to MJ with the lie in it was certainly not in the public domain. The Husseini invention was certainly not in the public domain. The conference where Professor Husseini presented his findings and was asked would it work for DNA was certainly not in the public domain. None of those things cited by counsel, articles and this and that and the other, I'm not relying on. What about the other prong, direct? This is the direct prong. This is the direct prong. That MJ, what, excuse me if they allow me to get Devlin. Devlin is the controlling case. They say it's the controlling case. We say it's the controlling case. And here's what Devlin says. Only two Ninth Circuit cases address the question of what constitutes direct and independent knowledge for the purpose of Section 3730E4. In both cases we held that a relator had direct and independent knowledge because he had discovered the information underlying his allegations of wrongdoing through his own labor. That is the holding of Devlin. That is the holding of Wang. There is nothing else engrafted upon direct and independent. And indeed the district court below on the independent prong, the district court below said that what MJ did was independent. That is not, that's really not an argument. We're just arguing about direct here. It is conjunctive. They are two requirements. But we're really not arguing about independent. We're arguing about direct. Now the disclosure formed the Caltech invention disclosure. Counsel said it came from Ken Johnson, who was not even an employee of MJ. That's simply wrong. Ken Johnson was an employee of a wholly owned subsidiary of MJ. Ken Johnson was directed by MJ. He was under their direction and control to go to Caltech and try to find, try to find the truth. And he went and one of the things he found was the invention disclosure form. And another thing he found was the license agreement between Caltech and Appleera, which recognized the government's Baidu rights. That certainly wasn't in the public domain. That's as private as you can get. So none of these things were in the public domain. And it's simply wrong to say that all MJ did was to rely upon things in the public domain. And finally, I'd like to clarify about the two articles that recognized federal funding for reduction to practice. Yes, those two articles do recognize and their count. One is a Caltech press release and the other is a nature article by the purported inventors. And they do say that there was that there was public funding. But that's not the point. Caltech came to the government. The fraud was that Caltech came to the government and said, but we didn't mean that. That's not accurate. There wasn't public funding when it was reduced to practice. That's what Caltech came to the government and said. They said, no, we got the public funding later when the invention was developed after it had been reduced to practice. That was the lie. And what MJ did to counteract that lie was go and find the Caltech laboratory notebooks that proved that the reduction to practice had in fact been done during the period of public funding. So all the public article did did was put somebody on notice. But then Caltech came in and countered it by telling a lie. And what MJ did was prove that it was a lie. And none of that was in the public domain. It was all things that MJ discovered by its own efforts, unmediated by anybody else. And that is the test of Devlin and Wang in this circuit for direct and independent knowledge. If there are no other questions. No further questions. Thank you. Thank you. May I say one other thing? I apologize. On the issue of whether or not the Wang case below, that's the HUANG rather than the WANG case below, resolves all the issues in this case about inventorship. The government is the real party in interest here. And the government can't be collaterally stopped by the decision below. And that's U.S. versus Morales. It's a 1984 case. I don't remember the site. I will file it. I'll get it and file it with the court. Thank you. Thank you. Your Honor. The case just argued will be submitted for decision.
judges: Hall, O'scannlain, Paez